GAY THEATRE CO. v. TENNESSEE ENTERPRISES, INC., et al.

Eastern Section. November 17, 1928.

Petition for Certiorari denied by Supreme Court, February 23, 1929.

Frantz, McConnell & Seymour, of Knoxville, for complainant.
Bachman, Wilkerson & Wilkerson, of Chattanooga, for defendants.

SNODGRASS, J.   This controversy is over the right to a guaranty fund of $6000, and as to whether or not an option to purchase a lease was exercised after a one year sublease at the rate of $700 per month, or whether the transaction was merely an extension of the first year's sublease at the price of $700 per m[onth, the purchase to be regarded as having taken place at the end of the second year extension. If the purchase took place at the end of the first year's sublease, then there is nothing due complainants on the purchase price of the lease.   If it took place after a year's extension of the sublease, then what was received that year was rental instead of a purchase payment, and defendants would be due $10,000 as the last installment of the purchase price.

There is another item of $2400 which defendants claim under the contract, asserted by cross-bill as an amount due from complainants by reason of the exchange of an organ, whereby complainants had agreed that the purchase price of the lease should be credited with that amount, to be retained in installments from month to month.

The Gay Theatre Company had leased for a period of twelve years the property subsequently turned over by it to the defendants, and as before its conversion into a theatre property it had been a mercantile property, in which some changes had thus been necessitated, regarding which, among other things, there was inserted in the lease of the complainants the following provision:

"The premises covered by this lease contract were formerly adapted to and used for mercantile and commercial business purposes; about two years ago the improvement were remodeled by the then lessee so as to adapt them to theatre purposes, for which they have since and are now being used, and it is the purpose and desire of second party, lessee, hereunder to make other changes, additions, modifications and repairs at its own expense, looking to an increase in the comfort, safety, attractiveness and adaptability of the premises and improvements thereon, for theatre purposes, and first parties, lessors, hereby enter their assent thereto, provided, such changes, additions, modifications and repairs be done and made in the promotion and preservation of absolute safety and in strict conformity with the laws and ordinances of the State  of Tennessee and City of Knoxville, Tennessee, and in the advancement and not deterioration of the value of the property and premises.

"Second party, lessee, covenants and agrees to and with the first parties, lessors, that it will place in trust along with the execution and delivery of this instrument on deposit in the Union National Bank of Knoxville, Tennessee, twelve hundred ($1200) dollars to the credit of R. H. Sansom as trustee,

and will on the sixth day (the fifth falling upon Sunday) of this month and fifth day of each and every month thereafter, during the lease period of the premises covered by this lease, place on deposit in said bank, or such other bank as the parties may hereafter agree upon, to the credit of said R. H. Sansom, trustee, or his successor in trust, the said sum of fifty ($50) dollars until said trust deposit shall reach the sum of six thousand ($6000) dollars, which deposit is intended to and shall constitute a guaranty fund to the lessors for the rehabilitation of the leased premises to a state of adaptability and utility for commercial or mercantile purposes equal at least to such state when changes were begun to be made therein for theatre purposes, which lessees covenant and agree to do, if lessors, shall so demand, upon the expiration or earlier termination of this lease.

"It is the understanding and agreement between parties hereto that in the event first parties upon the expiration or earlier termination of the lease, for cause or otherwise, shall elect not to restore the building for mercantile or commercial uses and purposes, but let it remain as improved for theatre purposes, that then said guaranty fund shall be paid over by the said R. H. Sansom, trustee, or his successors in trust to second party, lessee, or its successors, but in the event first party shall exercise the option, which is vested in them, to restore said building upon the leased premises to commercial or mercantile purposes, then second party may either make such restoration at its own expense or the guaranty fund so deposited in trust shall be taken over and belong to first parties and utilized to said purposes of restoration of the premises to such mercantile or commercial uses.

"It is the further distinct stipulation and agreement between parties that in the event second party shall, by reason of any sort of default under the terms of this lease forfeit the lease and such forfeiture shall be declared by first parties by reason of such default of second party, then and in that event the guaranty fund of six thousand ($6000) dollars, if so much has been accumulated at that time, or such less sum as shall have been accumulated thereof at that time, shall be forfeited to and become absolutely the funds of first parties, lessors, and this stipulation and agreement is made in this way because in the event of such forfeiture the guaranty fund accumulated is intended to cover as far as may be the rentals and income from the premises for the period within which a new lease or rental contract may be made and as liquidated damages as for a

breach of the covenants of the lease resulting in a forfeiture thereof.

"It is the further covenant and agreement between parties, that second party keeping this lease in force and performing all the covenants and conditions thereof, for the full lease term, shall have and is given the refusal of the premises for an additional lease term or period for five (5) years at such price and upon such terms as first parties, lessors, may be offered therefor, by another or other parties, or as parties may agree upon, provided that first parties shall not be required to accept a less stipulated annual rental than forty-five hundred dollars per annum, payable in monthly installments as provided for the last four years of this lease contract, even though they shall only be offered a less annual rental by other parties."

Before the termination of this lease negotiations for a sublease with the view of purchasing complainant's lease, which contained an option to renew for five years, was begun with complainants by the Signal Amusement Company, which latter is now succeeded in all its rights and obligations by the Tennessee Enterprises, Incorporated. These negotiations successfully resulted in the following contract and sublease between complainant and the Signal Amusement Company, through its trustee.

"This agreement made and entered into on this 23rd day of May, 1917, by and between the Gay Theatre Company, a corporation, with its principal office and place of business at Knoxville, Knox county, Tennessee, hereinafter called the first party, and W. E. Wilkerson, of Chattanooga, Tennessee, act·ing as Trustee for the Signal Amusement Company, a corporation with its principal office and place of business at Chattanooga, Tennessee, hereinafter called the second party, witnesseth :

"1st: That subject to the conditions, limitations, options and agreements hereinafter mentioned, the first party has sold and does hereby assign and sublet unto the second party all of its rights, title and interest in a criminal indenture executed on the 1st day of July, 1914, by and between Virginia A. Shields and others to first party, which indenture is recorded in the office of the register of Knox county, Tennessee, in Book 176, at page 180, et seq., to which reference is here made for a full and complete description of said instrument.

"2nd: The first party further leases to the second party all of its property situated in and upon said property and premises covered by the aforesaid lease, subject to the conditions, agreements and options hereinafter more fully set out.

"3rd: The second party is to operate the aforesaid theatre for one year from May 27th, 1917 at a rental of seven hundred dollars ($700) per month, the rent to be paid from June 1, 1917, and receipt is hereby acknowledged of $700 to cover the rent for the month of June. It is understood and agreed that the second party shall pay the July rent on June 15th, 1917, and thereafter during said period of one year he is to pay $700 per month rent on the 15th day of each month for the succeeding month.

"4th. The second party is hereby given the privilege and exclusive option to purchase said lease and said leased property at the end of said period of one year for a cash consideration of thirty-five thousand dollars ($35,000), and upon payment of same the first party will enter into any further instruments of writing which may be necessary to fully consummate said trade; or

"5th: The second party may thereupon purchase said lease and property for a total consideration of ninety thousand dollars ($90,000), payable at the rate of ten thousand dollars ($10,000) per year; the yearly payments to be made in twelve (12) equal monthly installments on the 1st day of each month for the ensuing month—ten (10) days grace being given in which to make said payments; and in the event the second party elects to do so, any proper further instruments of writing necessary will be entered into to complete said transaction; or

"6th: Upon the giving of at least sixty (60) days' notice of such election before the end of said first year period, it may terminate said lease agreement. In the absence of such election by second party, the first party may, at its option, treat the option set forth in number five above as having been accepted.

"7th: In the event of the selection of the option set forth in number five above, and also during the first year period, herein provided for, the first party shall pay all rents, taxes, insurance and other obligations that are required to be paid under the registered lease herein mentioned and in the event of the selection of said option set forth in number five the second party is to have and receive all prerequisites, privileges, rights, good-will, etc., of said theatre, together with all property thereof at the end of the ten (10) year period; and the first party will use its good offices in attempting to get an extention of said lease for second party upon the best possible terms.

"8th: The second party agrees and binds himself to take good care of said property and to make all needed, necessary and proper improvements thereon and therein; and he is to use

said property for legitimate purposes only and in the way and manner provided in said registered lease; and he further covenants that he will not permit or suffer any nuisance to be committed upon said premises or any use whatever to be made of said property which would or could in any way violate the terms of the aforesaid lease.

"9th: An inventory will be made of the property herein leased and optioned, and the same shall not be disposed of, removed or changed except by mutual agreement of the parties. In the event it is desired that any fixtures, musical instruments, or other articles shall be sold or exchanged for other articles, the same may not be done except by the written consent and agreement of the first party, and in such case the property taken in exchange shall be the property of the first party and shall be equal to or better than that which is given. But it is contemplated and agreed that the musical instrument now in said theatre may be exchanged for a Style '50' American Foto Player at a difference of not to exceed $6,150. In the event the party of the second part should not elect to purchase said theatre at the end of the first year, then he shall pay $3,075 of the difference in the exchange of said instrument for the new instrument and the party of the first part shall pay $3075. That is to say, the party of the first part and the party of the second part shall each pay one-half of the difference in price, which shall not exceed $3075 each, but if the exchange price should be less than $6150, each party shall pay only one-half of said difference paid in exchange. It is further understood and agreed that if the party of the second part should elect to purchase said theatre, etc., at the end of the first year, then he shall be allowed a credit of $2400 on the purchase price, to be deducted at the rate of $100 per month, beginning with the first month after the expiration of the first year.

"A duplicate copy of the contract to be executed or that may be executed between the Amercian Foto Player Company and the Signal Amusement Company or the party of the second part, shall be furnished to the party of the first part immediately upon its execution.

"10th: It is understood and agreed that the second party may sell, transfer and assign this lease to any responsible party or parties, provided the written consent of the first party to said sale and transfer is first had and obtained.

"11th: In the event any of said installments of rent or of purchase money shall be and become as much as ten (10) days overdue; or in the event of the violation of any of the covenants and agreements on the part of the·second party to be

kept and performed; or in the event said second party or assigns shall do anything which violates the terms of the said original registered lease herein optioned to said second party, then and in that event, the first party may, at its opion, without notice, terminate, this lease and enter upon and take charge of said property and premises.

"12th: The second party covenants that he has full power and authority to act for said Signal Amusement Company as trustee, and to bind it in the premises.

"In Witness Whereof, the parties of the first and second parts have hereunto subscribed their names, the said corporation signing its name by its proper official, the same being attested by its Secretary, this 3rd day of May, 1917.

"Gay Theatre Company,

"Attest:                   By C. F. Spence, President.

"W. E. Wilkerson,

"Trustee for Signal Amusement Co."

The Signal Amusement Company went into possession and operation of the theatre under this contract, and subsequently transferred all its interest therein and obligations thereunder to its co-defendant, the Tennessee Enterprises, Incorporated, but before this was done the following letter was addressed to the complainant by it which forms a part of this controversy:

"April 17, 1918.

"Gay Theatre Co.,

"Knoxville, Tenn.

"Attention Mr. C. H. Harvey, Vice Pres.,

"Re: Gay Theatre, now Strand.

"Dear Sirs:

"Confirming the agreement made relative to contract entered into on the 23rd day of May, 1917, between W. E. Wilkerson, Trustee for the Signal Amusement Company of the one part and the Gay Theatre Company of the other part, to which reference is hereby made, this letter is to reduce to permanent form said agreement, to-wit:

"The third paragraph of said contract provides that the theatre was to be operated 'from May 27, 1917, at a rental of $700 per month, the rent to be paid from June 1, 1917,' and for a period of one year at this rate.

"The fifth paragraph of said contract provides that after the first year should the property be taken over under optional purchase contract, then there should be paid each year $10,000, or $433.33 per month.

"The agreement entered into orally when Mr. Lindsey, Mr. Dowler, Jr., and myself were in Knoxville the other day in con-

ference with your Mr. Harvey and Mr. E. M. Johnson, modified said fifth paragraph as follows: The rental was to be continued not to exceed one additional year at the rate of $700 per month. This concession was made on your part because of the fact that the venture had not been a paying one to the Signal Amusement Company, or W. E. Wilkerson as trustee for said company, to take over the property under the option to purchase. It was further understood, however, that in the event the operation of the house should become profitable to an extent justifying the payment of said $833.33 per month, then that amount should be paid, although the one year extension during which $700 could be paid had not expired. It was further stated at this meeting that certain negotiations looking to the taking over of the Queen Theatre by the Signal Amusement Company were being had, and that if this theatre should be taken over by this company and the operation of the two houses should become profitable to the extent of justifying the payment of said $833.33, then said amount would be paid, although the one year extension period aforesaid had not expired. These negotiations looking to the taking over of the Queen by the Signal Amusement Company have terminated, and the Signal Amusement Company will not get the Queen Theatre.

"The foregoing is the exact agreement as understood by the writer. If correct in this, kindly have your Vice President sign hereunder, return one copy of this letter to me and retain the other for your files. (signed) W. E. Wilkerson, Trustee for Signal Amusement Co. W. E. Wilkerson."

"The Gay Theatre Company, by its Vice President, C. H. Harvey, does hereby ratify and confirm the foregoing statement of the contract modifying the original contract referred to in the foregoing letter, and does hereby declare said original contract modified in accordance with the terms and conditions set out in said letter.

"In witness whereof the Gay Theatre has caused its name to be subscribed hereto by its Vice President, he having authority so to do, on this 3rd day of May, 1918.

"Gay Theatre Co.,
"By C. H. Harvey, Vice President."

On November 19, 1925 the defendant, Tennessee Enterprises, Incorporated, which had succeeded to all the rights and privileges of the Signal Amusement Company, made a new lease with the owners of the fee of the property, who held the obligations of the original lease and were bound by its terms. While this lease was made before the expiration of the original lease to complainants

and for a different or more extensive term and in part pursuance of the option to extend, with reference to which it is contained the following recitation:

"This lease is made with the full apprehension and understanding upon the part of both the parties of the first and second parts that there is now existing on said leased premises a lease extending to the 27th day of May, 1927, to the Gay Theatre Company, with an option of renewal of the same for five years, which lease has been sold and assigned to the party of the second part and this lease is executed in fulfillment of said option to renew and in full performance of the same by the parties of the first part, and party of the second part covenants to and will fully indemnify the parties of the first part and hold them harmless against any and all claims of the Gay Theatre Company under said lease and option."

The consideration for this lease is recited as follows:

"That for and in consideration of the sum of six thousand ($6000) dollars cash in hand paid by the party of the second part to the parties of the first part upon the signing and execution of this lease, (which sum is in addition to a six thousand dollar deposit now in the Union National Bank of Knoxville, Tennessee, in the name of W. E. Mynderse as trustee and was placed there by the Gay Theatre Company, lessee in a certain lease dated the 1st day of July, 1914, as a guarantee fund to the lessors for the rehabilitation of the premises herein leased and as a guarantee of the performance of the terms of said lease by the lessee and which said sum of six thousand ($6000) dollars now on deposit with the said W. E. Mynderse, shall remain on deposit with him as security for said lease until the termination of same on May 27, 1927, at which time the same shall be paid to whom it may be determined the same rightfully belongs,) the parties of the first part in consideration of the said sum of six thousand ($6000) dollars at this time paid by the party of the second part herein, hereby release and relieve the said Gay Theatre Company and the party of the second part herein from the obligations contained in said lease, dated July 1, 1914, to restore and replace the building herein leased back in its original state as required in said lease and said parties of the first part hereby waive their right in said lease to require a restoration of said premises at the end of the term granted by said lease of July 1, 1914, or at any other time; and in further consideration of the rent, stipulations, conditions, agreements and covenants herein set forth, the parties of the first part have this day granted, demised, let and leased

and by these presents grant, demise, let and lease to the party of the second part the following described property and premises, to-wit:''

With agreed statement and other proof taken the case was heard before the Chancellor, who was of opinion and decreed that the guaranty fund belonged to original complainant, to whom nothing was due from defendants as the purchase price of the lease, but that there was due to defendant and cross-complainant the sum of $2400, the agreed credit on the organ which said cross-complainant had not retained, though entitled to do so, and awarded a recovery and execution therefor, but authorized the payment by the trustee of this much to cross-complainant, with balance to the original complainant out of the guaranty fund, taxing all the costs to the defendant, the Tennessee Enterprises, Incorporated.

To this decree insofar as it adjudged original complainant not entitled to a recovery against defendants for any further sum as purchase price of the lease and property, and insofar as a judgment of $2400 was rendered against it, original complainant excepted and appealed.

Defendant Tennessee Enterprises, Incorporated, also excepted to the decree adjudging it not entitled to the guaranty fund and appealed.

Perfecting the appeals errors have been assigned by both parties, challenging the action of the Chancellor adverse to their respective interests.

Our investigation of the record leads us to concur in the results reached by the Chancellor. The bill had been amended, stating that since the filing of the bill the defendant had paid two installments of its purchase price, making the total payments by it since it began the installments of $833.33. $80,000, the rental payments, it averred, for two of previous years having been made at the rate of $700 per month, the said payments having been made without prejudice. It was averred that there are due from the Tennessee Enterprises, Incorporated installments beginning with June, 1927, $833.33 per month up to this date, for which it asked decree, if the court should be of opinion that it is not entitled to have decree for the amount of $10,000 at this time. The bill had been dismissed as to Signal Amusement Company, the other defendant having succeeded to all its rights and obligations.

We think it apparent that the letter of April 17, 1918 from the trustee of the Signal Amusement Company to the complainant, which was affirmed by it, was an exercise of the option to purchase under the fifth clause, and that it contained an agreement to modify the purchase price by the difference between $700 per month for the first year and the $833.33 which would have been necessary to

bring the monthly payments up to the $10,000, provided, however, that if the profits in the first year's operation under the purchase could justify it the payments should nevertheless be at the rate of $833.33. So that the modification could not have related to any-thing but the first year under the purchase, and could not have exceeded in amount the sum of $1600. We do not see how this letter can be construed otherwise, notwithstanding the sentence "the rental was to be continued not to exceed one additional year at the rate of $700, per month." The context shows that this sentence was used in reference to a modification of the 5th paragraph, which did not contain the term "rental," but related to installment payments of $10,000 per year or $833.33 per month, and that the $700 per month instead of the $833.33 per month for the first year under the purchase was made to induce the company to take over the option to purchase, implying an understanding that it had been done, not an executory agreement to do so. The correctness of this view is made further apparent by the sentence which followed: i. e., "it was further understood, however, that in the event the operation of the house should become profitable to an extent justi-fying the payment of said $833.33 per month, then that amount should be paid, although the one year extension during which $700 could be paid had not expired."

We think it is thus manifest from the whole letter that the option was exercised by it, and that as inducing this result the tentative concession from $833.33 per month to $700 per month for the first year payment was made; also because the operation under the sub-lease had been at a loss; and that while the term "rental" was used in the sentence referred to, which contained other ambiguities, it was meant to apply to a purchase price payment. To this effect was also the testimony of Mr. Wilkerson.

This conclusion settles adversely to complainant the contention that it does not owe cross-complainant the $2400 on the musical instrument. In the lease to Signal Amusement Company, it was provided as an alternative with reference to the exchange price of a musical instrument as follows:

"It is further understood and agreed that if the party of the second part should elect to purchase said theatre, etc., at the end of the first year, then he shall be allowed a credit of $2400 on the purchase price, to be deducted at the rate of $100 per month, beginning with the first month after the expiration of the first year."

It was not claimed that this amount had been paid in any way, but it was insisted that the fact that it had not been deducted was an evidence that the defendant had not exercised his option until after the second year of the contract, and that therefore it evi-

denced no obligation. Having found against that contention there remains no reason why it should not be paid, though defendant and cross-complainant has during the time neglected its right to retain the monthly sums from the purchase price of the property.

There remains, therefore, only the question as to whether or not the guaranty fund of $6000 belonged to the complainant, which, except as indicated, succeeded in having the injunction made perpetual against its payment to defendant.

In this, too, we think the Chancellor was correct. We do not think the sale of the theatre property of complainant to the Signal Amusement Company, with the lease under terms appropriate, included any part of this guaranty fund. By the same contract an inventory of the property transferred, or to be transferred, was to be taken, and it was provided that "the same shall not be disposed of, removed or exchanged, except by mutual consent of the parties." In addition to the fact that money and property are not synonymous terms, the inventory provided for was taken and filed, and it does not refer to this fund.

In the contract of lease to complainant it was provided that this fund should be put up by accumulations, to guarantee the restoration of the property to other adaptability should the lessors require it, and to guarantee against loss occasioned by the nonfulfillment of the contract in other particulars. Regarding all this there is the following important provision:

"It is the understanding and agreement between parties hereto that in the event first parties upon the expiration or earlier termination of this lease, for cause or otherwise, shall elect not to restore the building for mercantile or commercial uses and purposes, but let it remain as improved for theatre purposes, that then said guaranty fund shall be paid over by the said R. H. Sansom, trustee (now Mynderse) or his successors in trust to second party, lessee, or its successors, but in the event first parties shall exercise the option, which is vested in them, to restore said building upon the leased premises to commercial or mercantile purposes, then second party may either make such restoration at its own expense, or the guaranty fund so deposited in trust shall be taken over and belong to first parties and utilized to said purposes of restoration of the premises to such mercantile or commercial uses."

It appears from the proof that it would cost a much larger sum than $6000 to make the restoration referred to, though the lessee was not obligated for a larger sum than $6000. It appears also from the fact that it had, even before the end of the lease, a party willing and anxious to take it for a longer term and at larger rental, paying also a bonus for the lease. It was therefore to the interest of

the lessors not to restore the property, but to continue its employment for theatre purposes. They had no arbitrary right to this fund, nor could they possess themselves of it arbitrarily. There was no violation of the lease or unfulfilled obligation on the part of the lessee entitling them to the fund concededly; nor was there any good faith election to restore the property to its former adaptability, the last contingency upon which the lessors could lay claim to it.

In the absence therefore of any transfer to other dominion it remained the property of the Gay Street Theatre Company, the complainant in this cause. Indeed defendant itself seems to recognize the fallacy of any direct claim to this guaranty fund, but asserts a right to it under an idea of subrogation. This we think is equally fallacious. The owners of the property never claimed the fund under any purchase or restoration. They had no such purpose, but leased the property to the defendant, Tennessee Enterprises, Incorporated, for a longer period than the option to renew evidenced, and for a larger rental, as stated, disclaiming any title to the guaranty fund, only protecting themselves against the former leasehold rights which defendant, owning, could well afford to guarantee. The owners, however, required a cash payment down from the company of $6000, which they regarded doubtless as sufficient for any purpose aside from the rental. While the inaccurate statement ''which sum is in addition to a six thousand dollar deposit now in the Union National Bank of Knoxville'' was used regarding this fund in connection with the consideration for the lease, it forms no part of the consideration and could only mean that it was meant to entirely distinguish the amount paid by the Tennessee Enterprises, Incorporated from it. The only contract relation to this guaranty fund established by the lease was to require that it be held subject to a proper determination as to its ownership.

The effect of this voluntary lease to the Tennessee Enterprises, Incorporated was to restore this fund to its rightful owner, the Gay Theatre Company, and the recitations in the lease regarding same were immaterial except as affording evidence that for reasons regarded as sufficient by the owners they did not elect to use the fund in any mechanical change of the property.

While defendant owned complainant's rights in the original lease, together with any right of renewal evidence thereunder, including its moral obligation to assist defendant in securing such renewal, which it discharged, its guaranty fund was not pledged to this service nor used in the larger venture, which may or may not have obviated its demand upon the part of the owners of the property to be genuinely used in changing its form; which we are satisfied was not desirable at the time, but rather that it continue as a theatre

274

building. The owners, however, seem to have been careful to provide against a further contingency in this particular by making it a part of the consideration for the lease that the defendant, at its inception, pay without condition a similar sum. This defendant voluntarily did, and for a larger term.

Thus it appears that complainant is indebted to fortuitous circumstances for the saving of its guaranty fund, and not to any compulsory assumption by defendant of any obligation of complainant in relation thereto. No right therefore of subrogation is involved.

We are content with the Chancellor's solution. All assignments are overruled and his decree affirmed. The costs of this court will be divided between the parties. The costs below will remain as adjudged by the Chancellor, and judgment for all of such costs will also go against any security involved.

Portrum and Thompson, JJ., concur.